IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MAGNA EQUITIES II, LLC; BTG          §
INVESTMENTS, LLC; AVI MIRMAN;        §
JAI ALAI INSURANCE, INC.;            §
DAVID A. FIELDS; MITCHELL LUKIN;     §
BETTY ANN PURDIE; SHANNON P.         §
PRATT; FRANCIS JUNGERS;              §
GEORGE GILMAN; MONICA WEHBY;         §
and TOWNES PRESSLER,                 §          CIVIL ACTION NO. H-17-1479
                                     §
                Plaintiffs,          §
                                     §
v.                                   §
                                     §
HEARTLAND BANK,                      §
                                     §
                Defendant.           §

### MEMORANDUM OPINION AND ORDER

Plaintiffs, Magna Equities II, LLC, BTG Investments, LLC, Avi Mirman, Jai Alai Insurance, Inc., David A. Fields, Mitchell Lukin, Betty Ann Purdie, Shannon P. Pratt, Francis Jungers, George Gilman, Monica Wehby, and Townes Pressler[1] (collectively, "Plaintiffs," "Purchasers," or "Investors"), bring causes of action against defendant, Heartland Bank ("Heartland" or "Defendant") for fraud, negligent misrepresentation, money had and received, unjust enrichment, and promissory estoppel. Pending before the court is Heartland Bank's Motion for Summary Judgment ("Defendant's MSJ")

---

[1]The parties have filed a Joint Stipulation for Dismissal of Claims and Counterclaim as to Plaintiffs Timur Salikhbayev and Frank Marshik Only (Docket Entry No. 75), which the court granted (Docket Entry No. 76).

(Docket Entry No. 61). For the reasons set forth below, Defendant's MSJ will be granted.

## I.  Background

In August of 2014 Heartland Bank and McLarty Capital ("Lenders") entered into a Credit Agreement and an Account Purchase Agreement with an oilfield services company called HII Technologies ("HII").[2] Matthew Flemming was HII's Chief Executive Officer. In October of 2014 HII requested approval from Heartland to acquire a profitable oilfield water management company called Water Transfer LLC ("Water Transfer" or "WTLLC"). When Heartland did not approve the acquisition, HII and Heartland discussed alternative methods of acquiring Water Transfer. By December of 2014 the terms of the proposed acquisition of Water Transfer had changed with respect to Water Transfer's lender, Security Bank. Flemming therefore suggested new terms for the acquisition.[3] From February to April of 2015 the Lenders became concerned about HII's financial status but continued to discuss HII's acquisition of Water Transfer on the condition that HII successfully raise around $3 million in equity.[4]

---

[2]Credit Agreement (Term Loan), August 12, 2014, Exhibit 1 to Defendant Heartland Bank's Second Amended Answer to Plaintiffs' Second Amended Complaint and Counterclaim ("Defendant's Second Amended Answer"), Docket Entry No. 46-1, pp. 20-111.

[3]See Dec. 31, 2014, Email, Subject: HII Technologies Requested Information, Exhibit 30 to Defendant's MSJ, Docket Entry No. 68-3, p. 20.

[4]See, e.g., March 9, 2015, Email, Subject: HII Technologies, Exhibit 29 to Defendant's MSJ, Docket Entry No. 68-3, p. 18; (continued...)

HII management engaged placement agent Roth Capital to raise the capital by issuing shares of HII Series B convertible preferred stock and warrants. On April 30, 2015, HII and Lenders entered into a Third Modification and Waiver Agreement to the Credit Agreement ("Third Modification Agreement").[5] In the Third Modification Agreement HII acknowledged it was in default, agreed to certain conditions to obtain a waiver of past defaults, and agreed to release claims HII might have against Lenders. In May of 2015 HII raised the required equity from Plaintiffs' purchase of Series B preferred stock, and Lenders waived existing defaults and the default rate interest. Plaintiffs executed a Securities Purchase Agreement ("SPA") with HII that governed the terms of their investments.[6] HII, Lenders, and Security Bank continued to discuss the terms of a consent agreement to the Water Transfer acquisition, but were unable to agree to a resolution. In June and July of 2015 HII had financial trouble and could not meet its

_____

[4](...continued)
Feb. 12, 2015, Email, Subject: HII, Exhibit 32 to Defendant's MSJ, Docket Entry No. 69-1, p. 5; March 6, 2015, Email, Subject: HII Technologies, Exhibit 33 to Defendant's MSJ, Docket Entry No. 69-2, p. 3; April 9, 2015, Email, Subject: Request for Waiver of covenant defaults, Exhibit 34 to Defendant's MSJ, Docket Entry No. 69-2, p. 8; April 22, 2015, Email, Subject: FW: HII - Business Terms, Exhibit 36 to Defendant's MSJ, Docket Entry No. 69-2, p. 14.

[5]Third Modification Agreement, Exhibit 2 to Defendant's Second Amended Answer, Docket Entry No. 46-1, pp. 112-127.

[6]See Securities Purchase Agreement, Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2.

obligations under the terms of the Third Modification Agreement.[7] On July 9, 2015, Heartland issued a Notice of Default and swept HII's accounts pursuant to the Credit Agreement.[8]

Heartland alleges that around July 15, 2015, it learned that HII instructed its customers to no longer make payments to a lockbox account administered by Heartland, in violation of the Credit Agreement.[9] Plaintiffs allege that at a meeting on July 16, 2015, Heartland explained that "unbeknownst to HII or Plaintiffs, it was going to foreclose on HII assets, create a new company, hire HII's CFO as president to run the new company, and usurp HII's opportunity to purchase Water Transfer, LLC."[10] On July 30, 2015, Heartland obtained a Temporary Restraining Order in the 129th District Court of Harris County, Texas, against HII requiring HII to direct all payments into the lockbox pursuant to the Credit Agreement.[11] On August 7, 2015, Lenders, HII, and Magna Equities II

---

[7]June 2, 2015, Email, Subject: Payments Sweep Request, Exhibit 39 to Defendant's MSJ, Docket Entry No. 69-2, pp. 25-27; July 2, 2015, Email, Subject: Cash Forecast 7-3-15, Exhibit 42 to Defendant's MSJ, Docket Entry No. 70-1, p. 22; July 8, 2018, Email, Subject: Cash Shortfall, Exhibit 43 to Defendant's MSJ, Docket Entry No. 70-1, p. 24.

[8]Notice of Default, Exhibit 28 to Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Plaintiffs' Response"), Docket Entry No. 86-2, pp. 3-4.

[9]Defendant's Second Amended Answer, Docket Entry No. 46-1, p. 15.

[10]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 9 ¶ 27.

[11]See Temporary Restraining Order and Order Setting Hearing For Temporary Injunction, Exhibit 4 to Defendant's Second Amended Answer, Docket Entry No. 46-1, pp. 195-99.

entered into a Fourth Modification and Forbearance Agreement to the Credit Agreement.[12] On September 18, 2015, HII filed for Chapter 11 bankruptcy.

Plaintiffs, who were the Series B preferred equity holders that invested in HII, allege that Heartland promised that "if HII raised at least $2.735 million, Defendant would issue a waiver of covenants and waive any defaults[,] . . . would permit HII to acquire . . . Water Transfer LLC[,] . . . [and] would allow HII to continue to operate as a going concern."[13] Plaintiffs allege that they relied on Heartland's fraudulent representations, relayed to them through Matthew Flemming, Roth Capital, or from documents such as SEC filings and placement documents, and that "[a]s a result of Defendant's bad faith and gross and intentional misconduct, the value of Plaintiffs' investments was destroyed and HII wound up in bankruptcy."[14] Plaintiffs bring causes of action against Heartland for fraud, negligent misrepresentation, money had and received, unjust enrichment, and promissory estoppel.[15] Plaintiffs brought this action against Heartland only -- not against HII, Flemming, or

---

[12]Fourth Modification to Credit Agreement, Exhibit 5 to Defendant's Second Amended Answer, Docket Entry 46-1, pp. 200-12.

[13]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, pp. 4-5 ¶ 22.

[14]Id. at 9 ¶ 29.

[15]Id. at 10-14 ¶¶ 30-61.

Roth Capital. On April 30, 2018, Heartland filed its Motion for Summary Judgment[16] to which Plaintiff filed a Response.[17]

## II. **Standard of Review**

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). The moving party is entitled to judgment as a matter of law if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex, 106 S. Ct. at 2553). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Id. If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and

---

[16]See Defendant's MSJ, Docket Entry No. 61.

[17]See Plaintiffs' Response, Docket Entry No. 82.

-6-

show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000). The court resolves factual controversies in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

## III. Analysis

Heartland argues that it is entitled to summary judgment because Plaintiffs lack standing to assert their claims, Plaintiffs' claims fail as a matter of law, and Plaintiffs' claims are barred by release and waiver and by the bankruptcy court's injunction.[18] Plaintiffs respond that they have standing under Fifth Circuit precedent, material questions of fact exist as to their claims that preclude summary judgment, and the release and

---

[18]Defendant's MSJ, Docket Entry No. 61, pp. 6-7.

-7-

waiver provisions and the bankruptcy court's injunction do not apply to their claims.[19]

## A. Standing

### 1. Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction tests the court's statutory or constitutional power to adjudicate the case. Home Builders Association of Mississippi, Inc. v. City of Madison, Mississippi, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002). In examining a Rule 12(b)(1) motion, the district court can consider matters of fact that may be in dispute.

> Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

Id. (citing Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996)). Dismissal on jurisdictional grounds alone is not a dismissal on the merits. Id. (citing Hitt v. City of Pasadena, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

---

[19]Plaintiffs' Response, Docket Entry No. 82, pp. 8-9.

2. Applicable Law

Standing questions "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 95 S. Ct. 2197, 2205 (1975). "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992). "Standing requires, at a minimum, three elements: injury in fact, a 'fairly traceable' causal link between that injury and the defendant's conduct, and the likelihood that the injury will be 'redressed by a favorable decision.'" Cadle Co. v. Neubauer, 562 F.3d 369, 371 (5th Cir. 2009) (quoting Lujan, 112 S. Ct. at 2136). "A defect in Article III standing is a defect in subject-matter jurisdiction." Id. at 374. See also Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 795 n.2 (5th Cir. 2011) ("dismissal for lack of constitutional standing . . . should be granted under Rule 12(b)(1)"). "Standing is a question of law" for the court to decide. Friends of St. Francis Xavier Cabrini Church v. Federal Emergency Management Agency, 658 F.3d 460, 466 (5th Cir. 2011). In deciding questions of law, including standing, involving claims based on state law, applicable state law governs. See Crocker v. Federal Deposit Insurance Corp., 826 F.2d 347, 349 (5th Cir. 1987), cert. denied, 108 S. Ct. 1075 (1988).

"In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will

be resolved by the court." <u>Heckman v. Williamson County</u>, 369 S.W.3d 137, 154 (Tex. 2012). Because the Texas test for standing parallels the federal test for Article III standing, Texas courts "turn for guidance to precedent from the U.S. Supreme Court, which has elaborated on standing's three elements." <u>Id.</u> "The standing inquiry 'requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.'" <u>Id.</u> at 156 (quoting <u>Allen v. Wright</u>, 104 S.Ct. 3315, 3325 (1984)).

When a company is in bankruptcy,

> [i]f a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim. If, on the other hand, a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action.
>
> Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case.

<u>Matter of Educators Group Health Trust</u>, 25 F.3d 1281, 1284 (5th Cir. 1994) (citations omitted). The court looks to the nature of the injury for which relief is sought. <u>Id.</u> "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." <u>Id.</u>

### 3. <u>Application</u>

The court must analyze each of Plaintiffs' claims to determine whether they assert a direct injury to Plaintiffs that is not

merely derivative of injuries to the debtor, HII. <u>In re Seven Seas</u> <u>Petroleum, Inc.</u>, 522 F.3d 575, 584 (5th Cir. 2008). Heartland argues that all of Plaintiffs' claims belong exclusively to the bankruptcy trustee because Plaintiffs allege injuries derivative of HII's injuries, and specifically that the fraud and negligent misrepresentation claims are derivative because the alleged misrepresentations were made to HII, not to Plaintiffs.[20] Plaintiffs respond that "HII could not have asserted the Investors' claims -- which are based on the fraud and misrepresentations of [Heartland] -- because HII would not have been in a position to assert the Investors' reliance on any alleged misrepresentations, and cannot claim to have suffered damages on account of the Investors' reliance."[21]

    a. Fraud and Negligent Misrepresentation

    **(i) Applicable Law**

Investors in a company that files for bankruptcy may bring claims for fraud and negligent misrepresentation when the claims are based on the defendant's misrepresentations made to the investors. <u>See</u> <u>Educators Group</u>, 25 F.3d at 1286; <u>Seven Seas</u>, 522 F.3d at 586. For example, in <u>Seven Seas</u> bondholders purchased $30 million in unsecured notes from Seven Seas Petroleum through private transactions or in the secondary market. <u>Seven Seas</u>, 522

---

[20]Defendant's MSJ, Docket Entry No. 61, p. 17.

[21]Plaintiffs' Response, Docket Entry No. 82, pp. 17-18.

F.3d at 578. The debtor, Seven Seas, retained a consulting firm to provide reserve estimates for oil and gas properties. Id. When deciding whether to purchase the unsecured notes, the bondholders relied on the allegedly false reserve estimates that were incorporated into Seven Seas' annual reports. Id. After Seven Seas entered bankruptcy the bondholders sued the consulting firm for negligent misrepresentation, fraud, violation of state securities law, and aiding and abetting fraud. Id. at 580-81. In determining whether the bondholders' claims were property of the bankruptcy estate the Fifth Circuit held that "[i]f [the defendants] knew that the reserve estimates were false and used them to induce the bondholders to purchase or refrain from selling the unsecured notes, then there was a direct injury to the bondholders that was independent of any injury to [the debtor]." Id. at 586. The court also "doubt[ed] that, under applicable state law, Seven Seas could have raised either claim as of the commencement of the bankruptcy case. . . . Seven Seas would not have been in a position to assert the bondholders' reliance on any alleged misrepresentations, or to claim to have suffered damages on account of such reliance . . . ." Id. at 586.

In Educators Group a group of school districts obtained health benefits for their teachers from Educators Group Health Trust ("EGHT"). Educators Group, 25 F.3d at 1283. When EGHT went bankrupt, the school districts became creditors of the estate and sued the principals of EGHT's third-party administrator, which had

marketed EGHT's benefits to the school districts, for various causes of action, including negligent management of EGHT and fraud. Id. at 1283. The court held that the claim for negligent management of EGHT belonged exclusively to the estate because it alleged a direct injury to EGHT, from which the school districts' injury was derived. Id. at 1285-86. But the court also held that certain claims such as "claims based on fraud, and conspiracy to commit fraud (to the extent that these claims are based on alleged false misrepresentations to the plaintiff school districts) . . . and [] the claim that the defendants negligently misrepresented the financial status of EGHT to the plaintiff school districts" belonged exclusively to the school districts because they asserted a direct injury "that the defendants intentionally misrepresented *to them* the financial situation of EGHT, and that they materially relied on such representations to their detriment." Id. at 1285-86.

Heartland argues that although Plaintiffs' Second Amended Complaint states that Plaintiffs were recipients of Heartland's promises, "their Interrogatory Responses make it clear that not a single one of the alleged representations was made directly to them."[22] Heartland also argues that "Plaintiffs do not allege any plausible facts to suggest that any representations Heartland allegedly made to HII were intended to reach Plaintiffs."[23]

---

[22]Defendant's MSJ, Docket Entry No. 61, p. 21 n.5.

[23]Id. at 22.

Plaintiffs argue that Plaintiff Mirman received the representations directly from Heartland, that the other investors received the representations through Flemming or Roth Capital, and that in Texas the misrepresentations do not need to be made directly to the investors to be actionable.[24]

### (ii)  Analysis

Plaintiffs' claims for fraud and negligent misrepresentation are not derivative of HII's injury and belong exclusively to Plaintiffs if they materially relied on misrepresentations that Heartland made to them.  Like the bondholders in <u>Seven Seas</u> and the school districts in <u>Educators Group</u>, Plaintiffs allege that they suffered a direct injury because they relied on false information Heartland provided to them, albeit indirectly, in deciding whether to purchase HII's Series B stock, and allege that Heartland "intended to induce Plaintiffs into investing millions of dollars."[25]  Plaintiffs seek compensation for the loss of their own investment.[26]  Although HII may have been harmed when Heartland allegedly reneged on its promises, HII was not harmed by Plaintiffs' investments.  Like the Fifth Circuit in <u>Seven Seas</u>, this court doubts that HII could have raised either claim as of the

---

[24]Plaintiffs' Response, Docket Entry No. 82, p. 25.

[25]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 2 ¶ 2.

[26]<u>Id.</u> at 12-13 ¶¶ 44-46.

-14-

commencement of the bankruptcy case because "[HII] would not have been in a position to assert the [investors'] reliance on any alleged misrepresentations, or to claim to have suffered damages on account of such reliance, . . . ." Seven Seas, 522 F.3d at 586.

Although Plaintiffs allege that Heartland committed wrongdoing against HII,[27] "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct."[28] Id. at 585. Plaintiffs have therefore alleged a direct injury to themselves to the extent that their fraud and negligent misrepresentation claims are based on representations Heartland knew would reach Plaintiffs and induce their investments. See id. at 586. Because Plaintiffs' fraud and negligent misrepresentations claims allege an injury that is not merely derivative of an injury to HII, and that HII could not have asserted as of the commencement of the bankruptcy case, the claims belong to Plaintiffs rather than to the bankruptcy estate.

---

[27]Defendant's MSJ, Docket Entry No. 61, p. 17.

[28]As the Fifth Circuit explains, "there is nothing illogical or contradictory about saying that [the defendant] might have inflicted direct injuries on both the bondholders and [the debtor] during the course of dealings that form the backdrop of both sets of claims." Seven Seas, 522 F.3d at 587. HII might have its own claims against Defendant that are independent from Plaintiffs' claims. For example, claims that Defendant conspired to make HII insolvent, commit fraud against HII, or that Defendant breached its contract with HII would belong to the bankruptcy estate. See Educators Group, 25 F.3d at 1285-86.

The parties do not specifically address whether Plaintiffs'
claims for money had and received, unjust enrichment, or promissory
estoppel belong to the bankruptcy estate or to Plaintiffs.
Heartland argues generally that each of Plaintiffs' claims is
property of the estate and that Plaintiffs' injury is derived from
HII's injury.[29]

b. Money Had and Received and Unjust Enrichment

"A party may recover under the unjust enrichment theory when
one person has obtained a benefit from another by fraud, duress, or
the taking of an undue advantage." <u>Heldenfels Brothers, Inc. v.
City of Corpus Christi</u>, 832 S.W.2d 39, 41 (Tex. 1992) (citing <u>Pope
v. Garrett</u>, 211 S.W.2d 559, 562 (Tex. 1948), and <u>Austin v. Duval</u>,
735 S.W.2d 647, 649 (Tex. App. — Austin 1987, writ denied)).

> Unjust enrichment is an equitable principle holding that
> one who receives benefits unjustly should make
> restitution for those benefits. . .
>
> "Unjust enrichment" occurs when the person sought to be
> charged [has] wrongfully secured a benefit or [has]
> passively received one which it would [be] unconscionable
> to retain. . . . "Unjust enrichment" characterizes the
> result o[f] failure to make restitution of benefits
> received under such circumstances as to give rise to
> implied or quasi-contract to repay. . . It has also been
> said that recovery under unjust enrichment is an
> equitable right and is not dependent on the existence of
> a wrong.

<u>Villarreal v. Grant Geophysical, Inc.</u>, 136 S.W.3d 265, 270 (Tex.
App. — San Antonio 2004, pet. denied) (citations omitted). When

---

[29]Defendant's MSJ, Docket Entry No. 61, pp. 16-17.

unjust enrichment is proved defendants must make restitution of benefits wrongfully received. Id.

A claim for money had and received "'belongs conceptually to the doctrine of unjust enrichment. . . .'" Edwards v. Mid-Continent Office Distributors, L.P., 252 S.W.3d 833, 837 (Tex. App. — Dallas 2008, pet. denied) (citations omitted). An action for restitution for money had and received "seeks to restore money where equity and good conscience require restitution. . . it is not premised on wrongdoing, but seeks to determine to which party, in equity, justice, and law, the money belongs." Id. (citing Staats v. Miller, 243 S.W.2d 686, 687 (Tex. 1951)). Such claims seek "to prevent unconscionable loss to the payor and unjust enrichment to the payee." Id. at 837 (citing Bryan v. Citizens National Bank in Abilene, 628 S.W.2d 761, 763 (Tex. 1982)). To prove a claim for money had and received "a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him." Edwards, 252 S.W.3d at 837 (citing Best Buy Co. v. Barrera, 248 S.W.3d 160, 162-63 (Tex. 2007) (per curiam), and Staats, 243 S.W.3d at 687).

Plaintiffs allege

> 49. Defendant holds money that, in equity and good conscience, belongs to Plaintiffs. Shortly after Plaintiffs made their investments, Defendant swept all of HII's cash and foreclosed on its assets. But for Defendant's promises that it would issue a waiver of covenants to waive HII's defaults, and allow HII to acquire Water Transfer LLC and continue operating, Plaintiffs would not have made their investments.[30]

---

[30]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 13 ¶ 49 (emphasis added).

. . .

> 54. [B]ut for Defendant's promises that it would issue
> a waiver of covenants to waive HII's defaults, and allow
> HII to acquire Water Transfer LLC and continue operating,
> Plaintiffs would not have made their investments.
> Shortly after Plaintiffs made their investments, however,
> Defendant swept all of HII's cash and foreclosed on its
> assets which unjustly enriched Defendant at the expense
> of Plaintiffs.[31]

Once Plaintiffs transferred their money to HII in exchange for Series B stock, the money belonged to HII. Therefore, any alleged harm that occurred to HII after Plaintiffs' investment is shared by all shareholders. HII was allegedly harmed and Heartland "unjustly enriched" when Heartland sent a notice of default to HII, "foreclose[d] on HII's assets . . . froze HII's checking accounts and swept all of its cash, including Plaintiffs' investments, thereby causing HII to collapse."[32] The harm alleged is to HII and is not exclusive to Plaintiffs because the money invested belonged to HII. Because the alleged harm is to HII and because HII could have brought this claim before the commencement of the bankruptcy case, Plaintiffs' claim for unjust enrichment is derivative of HII's injuries.

Similarly, Plaintiffs' money-had-and-received claim is derivative of HII's injuries because the money that Plaintiffs invested belonged to HII, the alleged wrongdoing occurred before HII filed for bankruptcy, and HII could have brought the claim "as

---

[31] Id. at 13-14 ¶ 54 (emphasis added).

[32] Id. at 8-9 ¶¶ 26, 28.

-18-

of the commencement of the bankruptcy case . . . ." <u>Seven Seas</u>, 522 F.3d at 586. Because Plaintiffs' injury is derivative of HII's injury, HII's bankruptcy estate is the proper party to bring unjust enrichment and money had and received claims against Heartland and Plaintiff lacks standing to assert these claims.

     c. Promissory Estoppel

Plaintiffs allege that they "substantially relied on Defendant's promises to their detriment when they invested in HII, only to have their investments swept away when Defendant suddenly reneged on its promises and noticed HII's default."[33] "The elements of a promissory estoppel claim are (1) a promise, (2) foresee-ability of reliance thereon by the promisor, and (3) substantial detrimental reliance by the promisee." <u>Trevino & Associates Mechanical, L.P. v. Frost National Bank</u>, 400 S.W.3d 139, 146 (Tex. App. — Dallas 2013, no pet.).

Like Plaintiffs' claims for fraud and negligent misrepresentation, Plaintiffs' promissory estoppel claim is based on their reliance to their detriment on Heartland's promises made to Plaintiffs before they invested their money. Because this claim is based on the inducement to invest, rather than on harm suffered after Plaintiffs invested -- which is shared by all investors and for which HII could bring claims -- Plaintiffs' harm is

---

[33] <u>Id.</u> at 14 ¶ 60.

-19-

distinctive, and their promissory estoppel claim is not based on injuries that are merely derivative of HII's injuries.

### d. Conclusion

The court concludes that Plaintiffs have standing to bring their claims for fraud, negligent misrepresentation, and promissory estoppel, but their claims for unjust enrichment and money had and received are derivative of HII's injuries and therefore belong to the bankruptcy estate.

## B. Whether Fact Questions Exist for the Remaining Claims

Heartland argues that the court should grant summary judgment and dismiss Plaintiffs' claims on the merits. Because the court will dismiss Plaintiffs' claims for money had and received and unjust enrichment for lack of standing, the court will consider whether there exists a genuine issue of material fact as to Plaintiffs' claims for fraud, negligent misrepresentation, and promissory estoppel.

### 1. Fraud

Plaintiffs allege that Heartland knowingly made false representations intending for Plaintiffs to rely on them.[34] The alleged false representations were that "if Plaintiffs could raise $2.735 million in equity"

---

[34]Id. at 10 ¶¶ 32, 35-36.

(1) Heartland would issue a waiver of covenants to waive HII's defaults;

(2) Heartland would permit HII to acquire Water Transfer LLC; and

(3) HII would be allowed to continue to operate as a going concern.[35]

Heartland argues that Plaintiffs do not satisfy the heightened pleading standard applicable to fraud claims under Rule 9(b).[36] Although failure to state a claim may serve as a basis for summary judgment, because Heartland relies on summary judgment evidence in its motion, the court will base its ruling on the summary judgment evidence instead of the sufficiency of Plaintiffs' pleadings. See Ashe v. Corley, 992 F.2d 540, 544 (5th Cir. 1993) ("Where a motion for summary judgment is based solely on the pleadings and makes no reference to affidavits, depositions, or interrogatories, it makes no difference whether the motion is evaluated under Rule 56 or Rule 12(b)(6) because both standards 'reduce to the same question.'").

> Under Texas law, the elements of fraud are (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

---

[35]Id. at 10 ¶ 32.

[36]Defendants' MSJ, Docket Entry No. 61, p. 22.

<u>Johnson v. World Alliance Financial Corporation</u>, 830 F.3d 192, 198
(5th Cir. 2016) (citation and quotation omitted).

Heartland argues that it is entitled to summary judgment
because Plaintiffs cannot prove justifiable reliance, Heartland did
not make the representations to Plaintiffs, and certain
representations were true or vague.[37] Heartland does not argue that
Plaintiffs do not satisfy the actual reliance element of fraud.
For clarity of the analysis, the court will begin with Heartland's
second argument -- that it did not make representations to
Plaintiffs.

### a. Representations

Heartland argues that Plaintiffs have not shown that it made
misrepresentations to Plaintiffs or to HII management, or that
Heartland expected and intended the misrepresentations to reach
Plaintiffs.[38] In Plaintiffs' Response they attach several email
exchanges and interrogatories as evidence that Heartland knew that
HII was using Heartland's representations to solicit investors.[39]

Under the Second Restatement of Torts § 531 "a person who
makes a misrepresentation is liable to the person or class or
persons the maker intends or 'has reason to expect' will act in

---

[37]<u>Id.</u> at 22-30.

[38]<u>Id.</u> at 28.

[39]Plaintiffs' Response, Docket Entry No. 82, p. 33.

reliance upon the misrepresentation." <u>Ernst & Young, L.L.P. v.</u> <u>Pacific Mutual Life Insurance Co.</u>, 51 S.W.3d 573, 578 (Tex. 2001) (citing Restatement (Second) of Torts § 531). The Texas Supreme Court held "that section 531's reason-to-expect standard comports with our jurisprudence . . . ." <u>Id.</u> at 580. "To prove that an alleged fraudfeasor had reason to expect reliance, '[t]he maker of the misrepresentation *must have information* that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and will influence their conduct.'" <u>Id.</u> at 581 (quoting Restatement (Second) of Torts § 531 cmt. d (1977)).

Plaintiffs' Second Amended Complaint is replete with conclusory allegations that Heartland knew its representations would reach Plaintiffs.[40] Plaintiffs' answers to Heartland's interrogatories state that each Plaintiff relied on Heartland's alleged representations in their decisions to invest in HII, described who relayed the representations to them, and believed that Heartland knew and expected the representations to be repeated to the Plaintiffs.[41] Moreover, Plaintiffs provide evidence that

---

[40]<u>See</u> Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 5 ¶ 22 ("Defendant knew and expected that its promises and representations would be relayed to potential investors such as Plaintiffs, so that HII could raise the requisite capital.").

[41]<u>See</u> Plaintiff Magna Equities II, LLC's ("Magna"), Monica Wehby's, Townes Pressler's, Francis Jungers', BTG Investments, LLC's, Betty Ann Purdie's, Avi Mirman's, Mitchell Lukin's, David (continued...)

Heartland had reason to expect that those representations would reach Plaintiffs and that Plaintiffs would rely on them. On March 5, 2015, Matthew Flemming sent an email to Phil Thomas, a representative of Heartland, and Christopher Smith, a representative of the other lender McLarty Capital, to which Flemming attached a memorandum that summarized HII's plans and stated that

> [t]he equity investors' interest is not just in yield but also in capital appreciation. Our solicitation of equity

_____

[41](...continued)
Field's, Shannon R. Pratt's, and George Gilman's Answers and Objections to Heartland Bank's First Set of Interrogatories, Exhibits 1-3, 5-10, and 12-13 to Defendant's MSJ, Docket Entry Nos. 63-1, 63-2, 63-3, 63-5, 63-6, 63-7, 63-8, 63-9, 63-10, and 64-1. See, e.g., Plaintiff Shannon R. Pratt's Answers and Objections to Heartland Bank's First Set of Interrogatories, Exhibit 12 to Defendant's MSJ, Docket Entry No. 64-1, pp. 10-11 (In her answers to the interrogatories, Plaintiff Pratt stated

> . . . I spoke with Matt Flemming by telephone who stated that the company's bank, Heartland Bank, would permit HII Technologies to acquire Water Transfer LLC and One Flow Energy if the company was successful in raising $3 million in equity during the May 2015 Series B offering. Mr. Flemming also stated that if the equity raise was successful, that Heartland Bank would waive HII Technologies' defaults. . . .

> Heartland Bank knew and expected these representations would be repeated to me because Heartland Bank conditioned the waiver of HII's existing defaults and the purchase of Water Transfer LLC on a successful equity raise by HII. I and other investors were approached so that this condition could be met. . . . But for Heartland Bank's representations about HII, I would not have participated in the HII Series B stock offering in May 2015.

Her statements are similar to those made by the other plaintiffs.).

> has centered on plan of HIIT bringing in new working
> capital for HIIT and to help the growth anticipated with
> the acquisition of WTLLC. Currently we anticipate
> closing a Series B type of offering subject to approvals
> by the end of this month made up of approximately 12
> investors.[42]

Smith responded to Flemming and Thomas:

> we do not think [HII] is in a position to take on $12
> more in debt to consummate the WTLLC acquisition. . . .
>
> All that being said, we would still be open to this
> acquisition if concurrently HIIT was successful in
> raising $3 million of new equity. . . . We will work with
> you towards an acceptable outcome on covenants and the
> WTLLC acquisition to the extent HIIT is successful on the
> equity raise hopefully in the next two weeks.[43]

In a May 1, 2015, email Flemming wrote Thomas that although the
consent agreement for the Water Transfer acquisition was separated
from the other agreements, Flemming "need[s] to get [the WTLLC
consent] in place for equity."[44]   Although Heartland did not
guarantee the approval of the Water Transfer acquisition, the
summary judgment evidence shows that Heartland knew, or should have
known, that Flemming was using the promise to acquire Water
Transfer to solicit investments.   It was therefore likely that
Heartland's representations would reach Plaintiffs and influence

---

[42]Memorandum Re: Plan of Action for our business moving
forward, Exhibit 9 to Plaintiffs' Response, Docket Entry No. 84-4,
p. 6 (emphasis added).

[43]March 9, 2015, Email, Subject: HII Technologies, Exhibit 10
to Plaintiffs' Response, Docket Entry No. 84-5, p. 2 (emphasis
added).

[44]May 1, 2015, Email, Subject: Update from HII, Exhibit 26 to
Plaintiffs' Response, Docket Entry No. 85-11, p. 2.

their conduct.  See Ernst & Young, 51 S.W.3d at 581.  The court concludes that Plaintiffs have provided sufficient evidence to create a fact issue as to whether Heartland had reason to expect that Plaintiffs would rely on its representations.

> b.  Justifiable Reliance

As to Heartland's alleged misrepresentation that HII would be permitted to acquire Water Transfer if Plaintiffs would raise $2.735 million in equity, Heartland argues that any justifiable reliance by Plaintiffs is negated as a matter of law.

Fraud requires that the plaintiff show actual and justifiable reliance.  Grant Thornton LLP v. Prospect High Income Fund, 314 S.W.3d 913, 923 (Tex. 2010).  In measuring justifiability, the court must determine whether "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part."  Id. (quotations and citations omitted).  "Justifiable reliance usually presents a question of fact.  But the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified."  JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C., 546 S.W.3d 648, 654 (Tex. 2018) (internal citations omitted).

> In determining whether justifiable reliance is negated as
> a matter of law, courts "must consider the nature of the
> [parties'] relationship and the contract."  . . .  [The
> defrauded] party "cannot blindly rely on a representation

by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations."

Id. "A person 'may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted.'" North Cypress Medical Center Operating Company, Limited v. Aetna Life Insurance Company, --- F.3d ---, No. 16-20674, 2018 WL 3635231, at *7 (5th Cir. July 31, 2018) (quoting Grant Thornton, 314 S.W.3d at 923 (quoting Lewis v. Bank of America NA, 343 F.3d 540, 546 (5th Cir. 2003))). Moreover, "a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." National Property Holdings, L.P. v. Westergren, 453 S.W.3d 419, 424 (Tex. 2015). "Either 'red flags' alone or direct contradiction alone can negate justifiable reliance as a matter of law." JPMorgan, 546 S.W.3d at 660 n.2. The court must "view the circumstances in their entirety while accounting for the parties' relative levels of sophistication." Id. at 656. Heartland relies primarily on JPMorgan to argue that Plaintiffs could not have justifiably relied on its representations as a matter of law, and Plaintiffs rely primarily on Jacked Up, L.L.C. v. Sara Lee Corporation, 854 F.3d 797 (5th Cir. 2017), to argue that this element of fraud is not negated.

In JPMorgan the plaintiff, a company formed by an experienced oil-and-gas businessman, signed an oil and gas lease for land that

-27-

turned out to be already leased to another entity. Id. at 650, 652. The plaintiff brought fraud and negligent misrepresentation claims against the lessor's agent, JPMorgan, alleging that it had justifiably relied on JPMorgan's statements that the land was open. Id. at 654. JPMorgan argued that the plaintiff's claims are negated as a matter of law because the plaintiff could not have justifiably relied on statements that the land was open considering the number of red flags present.[45] Id. at 654-55. The Fifth Circuit held that a letter of intent, which placed the responsibility on the plaintiff to investigate title and contained a negation-of-warranty provision, directly contradicted the representations that the plaintiff relied on. Id. at 659. The court concluded that the direct contradiction, the other red flags, and the plaintiff's sophistication in the oil-and-gas industry

_____

[45]The red flags that the defendant cited to preclude the plaintiff's justifiable reliance were that:

> (1) [JPMorgan's employee's] statement that he "would have to check" whether the property was open for lease; (2) JPMorgan's insistence on the stricter negation-of-warranty provision; (3) JPMorgan's refusal to accept responsibility for verifying title; (4) the letter of intent itself; (5) [JPMorgan's employee's] statement that other lessees were not doing careful title work; (6) [the plaintiff's] knowledge that competitors might delay recording their leases; (7) [the plaintiff's] knowledge that it ceased checking property records after signing the letter of intent; and (8) [the plaintiff's] landman's "doubts" at the closing, manifested by her request that [JPMorgan's employee] confirm once more whether the property was "open."

JPMorgan, 546 S.W.3d at 655.

negated any justifiable reliance that the plaintiff had on the alleged misrepresentation. Id. at 660.

Jacked up was a small start-up company that sold energy drinks to stores. Jacked Up, 854 F.3d at 802. It entered into a licensing agreement with the defendant, Sara Lee, under which Jacked Up agreed to license its brand name and proprietary energy ingredients in exchange for royalties. Id. Although the initial term of the licensing agreement was five years, it contained a number of termination clauses, including a change-of-control termination provision in the event that Sara Lee sold one of its divisions. Id. at 802-03. Shortly after the parties executed the licensing agreement, Sara Lee announced the sale of North American Beverage, the division that Jacked Up primarily worked with, and discontinued Jacked Up products. Id. Jacked Up sued Sara Lee for fraud and fraudulent inducement alleging that it relied on Sara Lee's representation that it was not planning on terminating the contract or selling North American Beverage. Id. at 810. The Fifth Circuit held that because some of Sara Lee's representations "were clearly contradicted by the licensing agreement itself . . . Jacked Up could not justifiably rely on these oral misrepresentations regarding the contract's unambiguous terms." Id. at 811 (internal quotation and citation omitted). For example, "Sara Lee's representation that it would not terminate the contract was contradicted by the numerous termination provisions in the contract." Id. However, the court held that whether Jacked Up

justifiably relied on Sara Lee's representation that it was not planning on selling North American Beverage presented a genuine issue of material fact. Id. at 812. The court reasoned that "[m]erely suggesting the possibility of selling the beverage division 'did not serve as a warning' that Sara Lee was actively planning a sale. Even if it were such a warning, Jacked Up could not have learned the truth with reasonable investigation." Id.

Heartland argues that Plaintiffs are experienced, sophisticated investors, that numerous red flags negate justifiable reliance, and that the alleged misrepresentation that HII would be permitted to acquire Water Transfer LLC contradicted the SPAs.[46] Plaintiffs argue that like Sara Lee's representation about North American Beverage in Jacked Up, "there was nothing obviously false about Defendant's representation that it would waive the defaults and permit the WTLLC acquisition, . . . ."[47]

### (i)    Sophisticated Investors

Plaintiffs' Response does not rebut Heartland's argument that each Plaintiff is highly sophisticated.[48] Flemming testified that all Plaintiffs were "sophisticated investors."[49] Plaintiffs BTG

---

[46]Defendant's MSJ, Docket Entry No. 61, p. 24.

[47]Plaintiffs' Response, Docket Entry No. 82, p. 30.

[48]Defendant's MSJ, Docket Entry No. 61, p. 27.

[49]Oral and Videotaped Deposition of Matthew C. Flemming ("Flemming Deposition"), Exhibit 15 to Defendant's MSJ, Docket
(continued...)

Investments, LLC and Magna Equities are both investment firms.[50]
The SPA that Plaintiffs each signed[51] states that Plaintiffs "[have]
such knowledge, sophistication and experience in business and
financial matters so as to be capable of evaluating the merits and
risks of the prospective investment in the Securities, and [have]
so evaluated the merits and risks of such investment."[52] Based on
this evidence and the fact that Plaintiffs do not dispute their
sophistication, the court concludes that Plaintiffs are
sophisticated investors for purposes of the justifiable reliance
inquiry. Sophisticated participants in a large deal "should be
expected to recognize 'red flags' that the less experienced may
overlook." JPMorgan, 546 S.W.3d at 656.

### (ii)   Red Flags

#### (A)   Purported Red Flags in the SPA

Heartland argues that red flags negate any justifiable
reliance Plaintiffs had on its representations regarding the Water

---

[49](...continued)
Entry No. 64-3, p. 40 lines 4-6 and 8-10 (Q: "The individuals who
invested in the Series B declared to you they were sophisticated
investors in the documents, correct?" A: "Correct. I believe
every one of them were accredited investors and had to attest to
that in the documentation.").

[50]Defendant's MSJ, Docket Entry No. 61, p. 27.

[51]The parties do not dispute that each Plaintiff signed
identical SPAs. See Defendant's MSJ, Docket Entry No. 61, p. 24
n.6; Plaintiffs' Response, Docket Entry No. 82, p. 30 ("the
provisions at issue are identical in each of the Investors' SPAs").

[52]Securities Purchase Agreement, Section 3.2(d), Exhibit 14 to
Defendant's MSJ, Docket Entry No. 64-2, p. 21.

Transfer acquisition.[53]  Heartland cites multiple sections of the

SPA and the Third Modification Agreement.  The court will view the

purported red flags as a whole relative to the circumstances and

the parties' sophistication.  JPMorgan, 546 S.W.3d at 655-56.

(1)  Section 3.1(x)

Heartland first cites to Section 3.1(x), "Representations and

Warranties," of the SPA, which states:

> **Disclosure**.  Except with respect to the material terms
> and conditions of the transactions contemplated by the
> Transaction Documents (including the disclosure
> schedules), [HII] confirms that neither it nor any other
> Person acting on its behalf has provided any of the
> Purchasers or their agents or counsel with any
> information that it believes constitutes or might
> constitute material, non-public information.  [HII]
> understands and confirms that the Purchasers will rely on
> the foregoing representation in effecting transactions in
> securities of [HII].  All of the disclosure furnished by
> or on behalf of [HII] to the Purchasers regarding [HII]
> and its Subsidiaries, their respective businesses and the
> transactions contemplated hereby, is true and correct and
> does not contain any untrue statement of a material fact
> or omit to state any material fact necessary in order to
> make the statements made therein, in light of the
> circumstances under which they were made, not
> misleading.[54]

Heartland argues that the alleged representation that HII would be

permitted to acquire Water Transfer was not included in and was

contradicted in the SPA.[55]  Plaintiffs respond that the represen-

tation in Section 3.1(x) was given by HII, not Heartland, that

---

[53]Defendant's MSJ, Docket Entry No. 61, p. 24.

[54]Securities Purchase Agreement, Section 3.1(x), Exhibit 14 to
Defendant's MSJ, Docket Entry No. 64-2, pp. 16-17.

[55]Defendant's MSJ, Docket Entry No. 61, p. 24.

"[n]owhere in the SPA do the Investors state that they have not received the misrepresentations for which they now sue[,]" that Investors did not disclaim their right to sue based on those misrepresentations, and that among the Transaction Documents referenced in Section 3.1(x) was a "Preliminary Term Sheet" that indicated that use of the proceeds from the equity raised would be to "fund acquisitions."[56] Heartland argues that if agents of HII told Plaintiffs that HII would acquire Water Transfer, then HII "did provide material non-public information to Plaintiffs, which is contrary to the representation made above and should have put Plaintiffs on notice."[57]

The language of Section 3.1(x) weighs against justifiable reliance because it states that HII did not "provide[] any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information."[58] As sophisticated investors, Plaintiffs should reasonably have questioned whether the acquisition of Water Transfer constituted material, non-public information. The remaining portions of Section 3.1(x) do not caution Plaintiffs

---

[56]Plaintiffs' Response, Docket Entry No. 82, pp. 30-31 (citing Preliminary Term Sheet, Exhibit 31 to Plaintiffs' Response, Docket Entry No. 86-5).

[57]Heartland Bank's Reply to Plaintiffs' Response to Heartland Bank's Motion for Summary Judgment ("Defendant's Reply"), Docket Entry No. 93, pp. 6-7.

[58]Securities Purchase Agreement, Section 3.1(x), Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, pp. 16-17.

against reliance on Heartland's representation, and may be fairly read to support reliance. For example, Plaintiffs could have read the language that "[a]ll of the disclosure furnished by or on behalf of [HII] to the Purchasers regarding [HII] . . . is true and correct" to mean that the representation by Heartland, relayed to Plaintiffs through HII, that HII would be permitted to acquire Water Transfer was a true and correct statement. However, Plaintiffs' argument that they justifiably relied on the representation because the "Preliminary Term Sheet" indicated that the use of proceeds from the equity raised would be used to "fund acquisitions" has no merit. Even if the Preliminary Term Sheet constituted a "Transaction Document" as defined in the SPA,[59] it did not mention Heartland or Water Transfer, and stated that it was prepared "FOR DISCUSSION PURPOSES ONLY" and that it "IS AN INDICATION OF INTEREST ONLY, AND IS NON-BINDING ON THE PARTIES PENDING EXECUTION OF A DEFINITIVE AGREEMENT."[60] Therefore, the Preliminary Term Sheet does not support Plaintiffs' claim that it justifiably relied on Heartland's representation. The court concludes that Section 3.1(x) is not necessarily a red flag that should have cautioned Plaintiffs against reliance because parts of

---

[59]Securities Purchase Agreement, Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, p. 6 ("'Transaction Documents' means this Agreement, the Registration Rights Agreement, the Warrants, the Certificate of Designation, and all exhibits and schedules thereto and hereto and any other documents or agreements executed in connection with the transactions contemplated hereunder.").

[60]Preliminary Term Sheet, April, 2015, Exhibit 31 to Plaintiffs' Response, Docket Entry No. 86-5, p. 2.

Section 3.1(x) can be interpreted to support either party's arguments.

## (2) Section 3.2(d)

Second, Heartland cites Section 3.2(d) of the SPA, which states that each Plaintiff

> understands that the Placement Agent [Roth] has acted solely as the agent of [HII] in this placement of the Securities and such Purchaser has not relied on the business or legal advice of [Roth] or any of its agents, counsel or affiliates in making its investment decision hereunder, and confirms that none of such Persons has made any representations or warranties to such Purchaser in connection with the transactions contemplated herein.[61]

Heartland argues that "[t]his directly contradicts Plaintiffs' allegation that they received alleged misrepresentations from Roth."[62]

Because Plaintiffs argue that they relied on Heartland's representation regarding the Water Transfer acquisition, allegedly relayed to them in part by Roth Capital, when deciding whether to execute the SPA and invest their money, this representation would be a "representation . . . in connection with the transactions contemplated herein." Since Plaintiffs acknowledge in Section 3.2(d) that Roth Capital has made no such representations, Plaintiffs were alerted that they could not rely on Roth Capital's

---

[61]Securities Purchase Agreement, Section 3.2(d), Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, p. 21.

[62]Defendant's MSJ, Docket Entry No. 61, p. 25.

representations regarding the Water Transfer acquisition when deciding whether to execute the SPA. Section 3.2(d) was therefore a red flag against reliance.

### (3)   Section 4.7

Third, Heartland argues that Section 4.7 of the SPA, "Use of Proceeds," says nothing about acquiring Water Transfer.[63] Plaintiffs respond that this is not determinative because "[t]he misrepresentation complained of is that upon a successful equity raise, Defendant would allow HII to acquire WTLLC, not necessarily that the proceeds of the raise would be used exclusively for that purpose."[64]

The court concludes that section 4.7 does not constitute a red flag because Plaintiffs alleged that they relied on Heartland's promise, relayed to them through Flemming, Roth, and others, that Heartland would permit HII to acquire Water Transfer if HII could raise the requisite equity, not that HII would acquire Water Transfer with the raised equity.[65]

---

[63]Id. at 25 (citing Securities Purchase Agreement, Section 4.7, Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, p. 26).

[64]Plaintiffs' Response, Docket Entry No. 82, p. 31.

[65]See, e.g., Plaintiff Magna's Answers and Objections to Heartland's First Set of Interrogatories, Exhibit 1 to Defendant's MSJ, Docket Entry No. 63-1, p. 4 ("At that meeting, Matt Flemming said that Heartland Bank would waive HII's exiting [sic] defaults and permit HII to acquire Water Transfer LLC if HII could raise $3 million."); Plaintiffs' Second Amended Complaint, Docket Entry No. 20, pp. 4-5 ¶ 22 ("Defendant promised that, upon a successful equity raise, it would permit HII to acquire a profitable oilfield water management company called Water Transfer LLC, . . . .").

### (4)  Section 3.1(i)

Fourth, Heartland cites Section 3.1(i) of the SPA, which states:

> Except for the issuance of the Securities contemplated by this Agreement, no event, liability, fact, circumstance, occurrence or development has occurred or exists or is reasonably expected to occur or exist with respect to [HII] or its Subsidiaries or their respective businesses, properties, operations, assets or financial condition, that would be required to be disclosed by [HII] under applicable securities laws at the time this representation is made or deemed made that has not been publicly disclosed at least one (1) Trading Day prior to the date that this representation is made.[66]

Heartland argues that HII CEO, Matthew Flemming, acknowledged that the Water Transfer acquisition was removed from the Third Modification Agreement because the Agreement would have to be disclosed to the SEC and HII could not announce the acquisition yet.[67]  Plaintiffs respond that this provision does not absolve Heartland of keeping its promises, and does not raise a red flag that Heartland's representations were false because HII was under no obligation to disclose the Water Transfer acquisition to the SEC while Heartland was still negotiating the acquisition's terms.[68]

Section 3.1(i) of the SPA negates Plaintiffs' reliance because it is an unambiguous contractual term that directly contradicts the

---

[66]Securities Purchase Agreement, Section 3.1(i), Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, p. 13.

[67]Defendant's MSJ, Docket Entry No. 61, p. 25 (citing Oral and Videotaped Deposition of Matthew C. Flemming, March 28, 2018, Exhibit 15 to Defendant's MSJ, Docket Entry No. 64-3, p. 72).

[68]Plaintiffs' Response, Docket Entry No. 82, p. 32.

alleged misrepresentations made by Heartland. <u>See</u> <u>JPMorgan</u>, 546 S.W.3d at 658 ("[A] party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms.") (internal citation and quotation omitted). "Whether a contract is ambiguous is a question of law for the court to decide." <u>Lopez v. Munoz, Hockema & Reed, L.L.P.</u>, 22 S.W.3d 857, 861 (Tex. 2000). Section 3.1(i) states that no disclosable event with respect to HII is reasonably expected to occur that has not already been publicly disclosed at least one day before the SPA was executed. Section 3.1(i) is an unambiguous term because it can be given a definite meaning and is not subject to two or more reasonable interpretations. <u>See, id.</u> Moreover, Plaintiffs do not argue that Section 3.1(i) is ambiguous, only that this Section does not "absolve Defendant of keeping its promises" or "raise a red flag that Defendant's representations are false."[69]

Although the court in <u>JPMorgan</u> acknowledged that "there is no direct contradiction if a reasonable person can read the writing and still plausibly claim to believe the earlier representation[,]" it concluded that the court of appeals applied the direct contradiction standard incorrectly:

> In reaching its conclusion, the court of appeals held that for a contradiction to preclude justifiable reliance, both the contractual clause and the extra-contractual representation it supposedly contradicts must explicitly speak to the same subject matter with sufficient specificity to correct and

---

[69]Plaintiffs' Response, Docket Entry No. 82, p. 32.

contradict the prior oral representation. Such a requirement is simply too strict to be workable as it essentially requires the contract and extra-contractual representation to use precisely the same terms.

JPMorgan, 546 S.W.3d at 659.

Plaintiffs relied on the alleged promise that HII would be permitted to acquire Water Transfer upon a successful raise of equity. Section 3.1(i) of the SPA states that "no event, liability, fact, circumstance, occurrence or development . . . is reasonably expected to occur or exist with respect to [HII] . . . that would be required to be disclosed by [HII] under applicable securities laws." Matthew Flemming testified that the acquisition of Water Transfer would have to be disclosed to the SEC.[70] For Plaintiffs to rely on Heartland's statement that HII would be permitted to acquire Water Transfer, they would have to ignore the contractual provision explaining that no disclosable event, such as Water Transfer's acquisition, was reasonably expected to occur with respect to HII. See id. at 659 ("For [the plaintiff] to rely on [the agent's] statement that the trust had title, it would have to ignore an express contractual provision explaining that JPMorgan and the trust make no guarantees pertaining to title."). Because a reasonable person could not read Section 3.1(i) and still believe that the Water Transfer acquisition was guaranteed, Section 3.1(i)

---

[70]Flemming Deposition, Exhibit 15 to Defendant's MSJ, Docket Entry No. 64-3, p. 73, lines 12-13 (Flemming stated that "when the third modification was executed, [the Water Transfer LLC acquisition] was a disclosable event.").

directly contradicts the alleged representation that Heartland would permit HII to acquire Water Transfer.

### (5) Third Modification Agreement

Fifth, Heartland argues that the terms of the Third Modification Agreement raise a red flag because it never mentioned the acquisition of Water Transfer, and because it stated that there were "NO UNWRITTEN ORAL AGREEMENTS" among the parties.[71] Plaintiffs respond that "it is unclear that the Investors even had access to the Third Modification and Waiver."[72] Plaintiffs argue that even if they were required to take notice of the Third Modification Agreement, the fact that it does not mention the acquisition does not raise a red flag because the parties had agreed to remove the acquisition from the Third Modification Agreement to comply with SEC rules, and that there were numerous writings between Heartland, Roth, and Flemming regarding the consent to acquire Water Transfer.[73]

Flemming testified that for SEC disclosure reasons the consent agreement for the Water Transfer acquisition would be "broken out separately" from the Third Modification Agreement.[74] Therefore, the

---

[71]Defendant's MSJ, Docket Entry No. 61, p. 26.

[72]Plaintiffs' Response, Docket Entry No. 82, p. 32.

[73]Id.

[74]Flemming Deposition, Exhibit 1 to Plaintiffs' Response, Docket Entry No. 83-1, pp. 47-48.

failure to mention Water Transfer in the Third Modification Agreement does not necessarily raise a red flag if Plaintiffs understood that there would be an independent document regarding the consent to acquire Water Transfer. However, an oral understanding that a separate document would govern the consent for the Water Transfer acquisition contradicts the clause in the Third Modification Agreement that there were "NO UNWRITTEN ORAL AGREEMENTS AMONG SUCH PARTIES."[75] The court is not persuaded by Plaintiffs' argument that they may not have received the Third Modification Agreement. The SPAs that Plaintiffs signed reference the Third Modification Agreement.[76] Sophisticated investors should reasonably be expected to read documents that are referenced in the agreements that they sign. If Plaintiffs were not provided with copies of the Third Modification Agreement, they could have requested them. Moreover, Plaintiffs' claim rests primarily on statements relayed to them by Matthew Flemming. Plaintiffs cannot blame Flemming, a signatory to the Third Modification Agreement who had intimate knowledge of its contents, for not giving Plaintiffs access to the Agreement while arguing that Heartland is liable for Flemming's representations to Plaintiffs. Because the SPAs referenced the Third Modification Agreement, which contained a

---

[75]Third Modification and Waiver Agreement, Section 4.11, Exhibit 22 to Defendant's MSJ, Docket Entry No. 66-2, p. 29.

[76]See Securities Purchase Agreement, Schedule 3.1(d), 3.1(i), 3.1(l), Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, pp. 40, 47-48.

clause stating that it was the entire agreement, the Third Modification Agreement served as a red flag against any reliance on Heartland's representations.

(6)    Section 5.2

Finally, Heartland argues that the SPA's merger clause makes Plaintiffs' reliance unjustified.[77]  The merger clause states:

> **Entire Agreement**.  The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.[78]

The merger clause in Section 5.2 of the SPA was a warning to sophisticated investors that they could not rely on representations not covered explicitly by the SPA.  See Freedom Equity Group, Inc. v. MTL Insurance Company, 2015 WL 1135186 at *3 (Tex. App. — Houston [1st Dist.] March 12, 2015) ("[t]he merger clause in the [] agreement forecloses [the plaintiff's] alleged reliance on oral promises made before the execution of the [] agreement.").  Because Plaintiffs are sophisticated investors who could have conditioned their investment on the express obligation that Heartland would permit HII to acquire Water Transfer, the merger clause was a red

---

[77]Defendant's MSJ, Docket Entry No. 61, pp. 26-27.

[78]Securities Purchase Agreement, Section 5.2, Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, p. 29.

flag that cautioned against Plaintiffs' reliance on Heartland's alleged representation.

### (B) Conclusion

These red flags should have put Plaintiffs on notice that they could not rely on Heartland's alleged representation that HII would be permitted to acquire Water Transfer. Absent adequate contractual protection in the SPA or in the Third Modification Agreement that HII would be allowed to acquire Water Transfer, Plaintiffs assumed the risk that HII might never be allowed to acquire Water Transfer. See CBH Equity, LLC v. Murphy Oil USA, Inc., Civil Action No. 2:15-137, 2018 WL 3647087 at *5 (S.D. Tex. Aug. 1, 2018) (in holding that the plaintiff's reliance on statements regarding the execution of an easement with Wal-Mart was not justified, the court reasoned "[a]bsent any other protective measure, [plaintiff's] recourse was to postpone or refuse to close the transaction unless and until Wal-Mart executed the easement. Absent that, he took his chances that the cross-access easement would be further delayed").

The court concludes that the "red flags" discussed above, together with Plaintiffs' sophistication, and the direct contradiction between Heartland's representations regarding the Water Transfer acquisition and Section 3.1(i) of the SPA negate Plaintiffs' justifiable reliance on Heartland's misrepresentations. See JPMorgan at 660 n.2 ("Either 'red flags' alone or direct

contradiction alone can negate justifiable reliance as a matter of law."); <u>North Cypress Medical</u>, --- F.3d ---, 2018 WL 3635231 at *8 ("Here, red flags, Aetna's independent investigation, and Aetna's sophistication negate any justifiable reliance Aetna had on NCMC's alleged misrepresentations."). Heartland is therefore entitled to summary judgment on Plaintiffs' fraud claim regarding the acquisition of Water Transfer.

### c. Truth of Alleged Misrepresentations

Heartland argues that it is entitled to summary judgment on Plaintiffs' fraud claim that is based on Heartland's alleged promise that it would waive HII's defaults because it <u>did</u> waive HII's then-existing defaults.[79] Plaintiffs respond that because the Notice of Default that Heartland sent contained no description of the default, "there is a fact issue regarding whether Defendant's Notice of Default was fraudulent, or, if a default actually existed, whether it was a default that Defendant had waived."[80]

The Notice of Default stated that HII was "in default under the Loan Agreement" and defined "Loan Agreement" as "[t]hat certain Credit Agreement dated August 12, 2014, as amended from time to time."[81] The Third Modification Agreement amended the Credit

---

[79]Defendant's MSJ, Docket Entry No. 61, p. 28.

[80]Plaintiffs' Response, Docket Entry No. 82, p. 34.

[81]Notice of Default, Exhibit 28 to Plaintiffs' Response, Docket Entry No. 86-2, p. 3 (emphasis added).

Agreement.[82]   Therefore, the Notice of Default referred to default under the Credit Agreement as amended by the Third Modification Agreement.   The Third Modification Agreement listed HII's defaults as of the effective date, May 20, 2015, and defined them as the "Existing Defaults."[83]   Section 1.01(a) of the Third Modification and Waiver Agreement expressly "waive[d] the Existing Defaults" of HII.[84]   Heartland reserved the right to enforce future defaults,[85] and Plaintiffs do not argue otherwise.   Morever, the SPAs that Plaintiffs signed state that "Heartland will waive all existing defaults."[86]   Because Heartland unequivocally waived existing defaults in the Third Modification Agreement as allegedly promised, Plaintiffs have failed to raise a fact issue regarding the falsity of Heartland's representation.   The court concludes that Heartland is entitled to summary judgment as to Plaintiffs' fraud claim based on the alleged representation that Heartland would waive HII's defaults.

---

[82]See Third Modification and Waiver Agreement, Exhibit 16 to Defendant's MSJ, Docket Entry No. 64-4, p. 2.   The Third Modification Agreement references the terms of the "Account Purchase Agreement dated August 12, 2014," and sets out the amendments to that agreement.

[83]Id. at 2.

[84]Id. at 3.

[85]Id. Section 4.05, at 11.

[86]Securities Purchase Agreement, Schedules 3.1(i), 3.1(l), Exhibit 14 to Defendant's MSJ, Docket Entry No. 64-2, pp. 47-48.

2. Negligent Misrepresentation

Heartland argues that it is entitled to summary judgment on Plaintiffs' negligent misrepresentation claim because there is no justifiable reliance, the claim is based on future promises, the promises were true, and the claim is based on the same operative facts that form the fraud claim.[87] Plaintiffs respond that this claim survives "for the same reason that its fraud claim concerning the wavier [sic] of the defaults survives."[88]

> The elements of a cause of action for [negligent misrepresentation] are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, L.L.C., 659 F.3d 450, 458 n.8 (5th Cir. 2011) (quoting Federal Land Bank Association v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991)). Because both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance and because the court has concluded that Plaintiffs did not justifiably rely on alleged representations regarding the Water Transfer acquisition, to the extent that Plaintiffs' negligent misrepresentation claim is

---

[87]Defendant's MSJ, Docket Entry No. 61, pp. 30-32.

[88]Plaintiffs' Response, Docket Entry No. 82, p. 36.

based on the Water Transfer acquisition representation, it fails as a matter of law. See Grant Thornton, 314 S.W.3d at 923 ("Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance."). Because falsity of the information is an element of a negligent misrepresentation claim and because the court has concluded that Plaintiffs have not raised a genuine issue of material fact regarding Heartland's alleged representation that it would waive HII's defaults, to the extent that Plaintiffs' claim for negligent misrepresentation is based on the waiver-of-defaults representation, it fails as a matter of law. Therefore, Heartland is entitled to summary judgment on this claim.

### 3. Promissory Estoppel

Plaintiffs allege that they substantially relied on Heartland's promises to their detriment that "if the Investors invested $2.735 million into HII, it would issue a waiver of covenants to waive HII's defaults, allow HII to acquire Water Transfer LLC, and permit HII to continue operating."[89] Heartland argues that Plaintiffs' promissory estoppel claim fails because the alleged promises were covered by the Third Modification Agreement, were true, or were too vague or indefinite to support the claim.[90]

---

[89]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 14 ¶¶ 58, 60.

[90]Defendant's MSJ, Docket Entry No. 61, pp. 34-36.

Plaintiffs respond that their claim is "not barred by the express terms of a contract because Investors are not a party to any contract with Defendant, nor are the representations for which Investors sue covered within the express terms of any written agreement."[91]  Plaintiffs also cite multiple email exchanges to argue that none of the promises were too vague to be enforceable.[92]

Promissory estoppel "estops a promisor from denying the enforceability of the promise." Wheeler v. White, 398 S.W.2d 93, 96 (Tex. 1965).  Under Texas law the elements of promissory estoppel are: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." English v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983).  In addition, promissory estoppel requires a reasonable or justified reliance on the alleged promise. Clardy Manufacturing Co. v. Marine Midland Business Loans Inc., 88 F.3d 347, 360 (5th Cir. 1996); Simulis, L.L.C. v. General Electric Capital Corp., 439 S.W.3d 571, 577 (Tex. App. — Houston [14th Dist.] no pet.).

Plaintiffs' promissory estoppel claim is based on the same alleged promises as Plaintiffs' other claims -- that upon successfully raising equity Heartland would waive HII's defaults,

---

[91]Plaintiffs' Response, Docket Entry No. 82, p. 40.

[92]Id. at 40-41.

-48-

permit HII to acquire Water Transfer LLC, and allow HII to continue to operate.[93] The court has already concluded that Heartland's alleged promise to waive HII's defaults was true because it did waive the defaults in the Third Modification Agreement. The court has also concluded that Plaintiffs' reliance on the alleged promise regarding the Water Transfer acquisition was not justified. Therefore, Plaintiffs raise no genuine issue of material fact as to their promissory estoppel claim, and Heartland is entitled to judgment as a matter of law.[94]

---

[93]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 14 ¶ 58.

[94]Plaintiffs also allege that Heartland represented that "HII would be allowed to continue to operate as a going concern." Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 10 ¶ 32. For the same reasons the court has concluded that Plaintiffs' reliance on the promise regarding the Water Transfer acquisition was not justified, any reliance on the promise that HII would be allowed to continue to operate is not justified. Nowhere in the SPA or the Third Modification Agreement does Heartland make this representation, and the merger clause of the SPA and Section 4.11 of the Third Modification Agreement indicate that no oral promises outside the agreements existed. Moreover, because the court concludes that Heartland waived existing defaults but not future defaults, Plaintiffs' reliance on this alleged representation was not justified. Plaintiffs could not have reasonably expected Heartland to permit HII to continue operating and not issue a notice of default if HII defaulted on its obligations to Heartland. Heartland is therefore entitled to summary judgment on Plaintiffs' fraud claim with respect to this alleged representation. The same alleged representation is a basis for Plaintiffs' negligent misrepresentation and promissory estoppel claims. Because the court will grant summary judgment on those claims with respect to the first two alleged representations for the same reasons as the fraud claim, discussed in Part III(B)(2) and (B)(3), the court will also grant summary judgment on Plaintiffs' negligent misrepresentation and promissory estoppel claims with respect to this alleged promise.

## IV.  Conclusions and Order[95]

For the reasons stated in Part III(A), above, the court concludes that Plaintiffs lack standing to bring their claims for money had and received and unjust enrichment because those claims are property of the bankruptcy estate.  For the reasons stated in Part III(B), above, the court concludes that Plaintiffs have failed to raise a genuine issue of material fact as to Plaintiffs' claims for fraud, negligent misrepresentation, and promissory estoppel. For these reasons, Heartland Bank's Motion for Summary Judgment (Docket Entry No. 61) is **GRANTED**.

**SIGNED** at Houston, Texas, on this 27th day of August, 2018.

SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[95]Because the court has concluded that Heartland is entitled to summary judgment on Plaintiffs' claims, it will not address Heartland's arguments that Plaintiffs' claims are barred by release and waiver and the bankruptcy injunction.